IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES OF AMERICA,           )
                                    )
                Plaintiff,          )
                                    )
        v.                          )       Criminal Action No.
                                    )       09-00252-01-CR-W-HFS
RODOLFO ZAMBRANO,                   )
                                    )
                Defendant.          )

**REPORT AND RECOMMENDATION TO DENY
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

Before the court is defendant's motion to suppress evidence on the ground that defendant's residence was searched without his consent and without a warrant. I find that defendant voluntarily consented to the search of his residence. Therefore, defendant's motion to suppress should be denied.

*I. BACKGROUND*

On December 10, 2008, police conducted a knock and talk after receiving several tips that defendant was selling drugs from 2613 Lister. According to the police, defendant consented to a security sweep of the house and then to a search of the house for drugs, which were found. According to defendant, he did not consent.

On August 11, 2009, an indictment was returned charging defendant with one count of possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). Defendant filed the instant motion to suppress on January 29,

2010 (document number 21).  On February 11, 2010, the government

filed a response, arguing that defendant voluntarily consented to

the search of his residence (document number 25).

On February 16, 2010, I held an evidentiary hearing on

defendant's motion to suppress.  The government appeared by

Assistant United States Attorney Stefan Hughes.  The defendant

was present, represented by Robb Edmonds.  Detective Luis Ortiz

testified, as did defendant.  In addition, the following exhibits

were admitted:

P. Ex. 1   Photograph of the front of the residence

P. Ex. 2   Photograph of firearm

P. Ex. 3   A document from Johnson County Court Services addressed
           to defendant at 1815 Hardesty, Kansas City, Missouri
           64127

P. Ex. 4   State of Missouri Department of Corrections travel
           permit to defendant listing a '99 Chrysler

P. Ex. 5   Money transfer document with the name Leticia Zambrano
           with the address of 1815 Hardesty showing transfer of
           $300 to Montes Elsa Guadalupe in Mexico

P. Ex. 6   Photograph of a kilo of cocaine found on the kitchen
           counter of defendant's residence

P. Ex. 7   Photograph of a kilo of cocaine found in a drawer in
           defendant's kitchen

P. Ex. 8   Photograph of defendant's driver's license, listing
           1815 Hardesty Avenue as his address, and $2,280 seized
           from his wallet

P. Ex. 9   Photograph of cash seized from defendant

P. Ex. 10  Photograph of the digital scale found in defendant's
           basement

P. Ex. 11 Copy of consent to search form presented to defendant

P. Ex. 12 Copy of a Property Inventory Report showing that keys
to 2613 Lister Avenue and keys for a green Chrysler
were recovered from defendant

P. Ex. 14 Report of interrogation

P. Ex. 13 Copy of a <u>Miranda</u> waiver form written in Spanish

D. Ex. 401  Photograph of the front of the residence

D. Ex. 402  Photograph of the front of the residence

D. Ex. 403  Photograph of the storm door and door

D. Ex. 404  Photograph of the storm door closed

D. Ex. 405  Photograph of the storm door closed

D. Ex. 406  Photograph of the storm door open and the door closed

D. Ex. 407  Photograph of the inside of the residence

D. Ex. 408  Photograph of the opposite of the main entrance

D. Ex. 409  Photograph of the kitchen

D. Ex. 410  Photograph of the living or dining room and a table

D. Ex. 411  Photograph of a window next to a door

D. Ex. 412  Photograph of the TV and the main door

D. Ex. 413  Photograph of an open storm door

D. Ex. 414  Photograph of living room[1]

---

[1]These photographs were taken when it was light outside,
which is different from when the officers approached the house.
Detective Ortiz testified it was 6:00 p.m. in December, it was
dark outside, and he could see inside the house because the
lights were on inside (Tr. at 39).  In addition, when Detective
Ortiz was identifying the defendant's exhibits, he testified that
the furniture had been moved around and was no longer in the same
place it had been on December 10, 2008 (Tr. at 47-49).  Defendant
also testified that the furniture was actually different

## II. *EVIDENCE*

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact:

1.  On October 24, 2008, Detective Luis Ortiz received information from a confidential informant that defendant was selling large amounts of cocaine from his residence at 2613 Lister in Kansas City, Missouri (Tr. at 3-4, 30-31). Defendant was described as a heavy-set Hispanic male, 250 to 300 pounds, five feet ten inches to six feet tall, who drives a green Chrysler with tinted windows and personalized license plates (Tr. at 4, 31). Detective Ortiz had received similar information from at least three other confidential informants (Tr. at 4-5, 31-32). At least three times after that, Detective Ortiz conducted surveillance on defendant's residence to try to verify the information provided by the informants (Tr. at 5, 32). He observed defendant coming and going from the residence and using the Chrysler (Tr. at 5, 32). Detective Ortiz also did a computer check and learned that defendant had been arrested in Kansas City, Missouri, and in Overland Park, Kansas, for drug offenses (Tr. at 32).

2.  At approximately 5:00 p.m., on December 10, 2008, Detective Ortiz and other law enforcement officers were

---

furniture and it was not in the same place as the old furniture (Tr. at 96). The photographs marked as defendant's exhibits were taken by defense counsel on February 12, 2010 (Tr. at 75).

conducting surveillance on defendant's residence (Tr. at 6). The
officers observed defendant come out of the residence, get into
his car for a few moments, then return to the residence (Tr. at
6). More officers were called in so that a knock-and-talk could
be done (Tr. at 6, 34). With Detective Ortiz when he called for
more officers were Detective Hendershott and Special Agent King
from Immigration and Customs Enforcement ("ICE") (Tr. at 7).
Special Agent Lester was just a few blocks away and was called by
Detective Ortiz (Tr. at 7).

3.   The officers observed the storm door and the main door
to the residence about halfway open (Tr. at 7). At about 6:00
p.m., Detective Ortiz, Detective Hendershott, and Special Agent
King went to the front door (Tr. at 36). It was dark by then and
the officers could see inside because the lights were on inside
(Tr. at 39). Detective Ortiz knocked on the storm door and
identified himself to defendant who could be seen sitting on a
couch inside the house (Tr. at 7-8, 36, 42, 52, 67). Detective
Ortiz also saw Jesus Zambrano who was vacuuming (Tr. at 9, 40,
41, 52).

4.   Defendant came to the door (Tr. at 8, 42). Detective
Ortiz said he and the others were with the police department and
ICE and had received information that defendant could possibly
have narcotics in his residence and that he had been selling
narcotics from his residence (Tr. at 8, 43). Detective Ortiz

asked defendant if they could come inside to discuss the allegations, and he allowed the officers inside his residence (Tr. at 8-9, 43).

5.    As the officers entered the residence, defendant stated that it was not his house, that he was taking care of it for his aunt, Lourdes Quesada, who was in Mexico (Tr. at 9, 43-44, 84, 105).  He said he had been taking care of the house for about three months (Tr. at 9, 43-44).  For officer safety, Detective Ortiz asked defendant for permission to look through the house for other people (Tr. at 9-10).  Defendant gave his consent (Tr. at 10).  No one threatened defendant or promised him anything in exchange for that consent (Tr. at 10).  A security sweep was performed by Detective Hendershott, Special Agent King, and Dave Pruetting, who was Detective Ortiz's supervisor (Tr. at 10).  No other people were discovered during the security sweep (Tr. at 10-11).

6.    Detective Ortiz asked defendant if there were any narcotics in the house, and he said there were not (Tr. at 11). Detective Ortiz asked defendant for permission to search the residence for narcotics (Tr. at 11).  Detective Ortiz told defendant he did not have to consent (Tr. at 56).  Defendant said his aunt owns the residence, and that the officers could search the residence but defendant could not give written consent because it was not his house (Tr. at 11, 12, 13-14, 24, 54, 62).

7. Detective Ortiz spoke to defendant in both English and Spanish (Tr. at 11, 12, 44). Both defendant and Detective Ortiz are fluent in Spanish and English (Tr. at 11-12, 74). The consent-to-search form presented to defendant was written in both English and Spanish[2] (Tr. at 12). Defendant read the Spanish version (Tr. at 12, 24). When defendant declined to sign the form, he said it was because his aunt was the owner of the residence (Tr. at 12). Defendant did not mention anything about an Edwin Rodriguez living in the residence (Tr. at 12-13). No one promised defendant anything to get him to consent to the search (Tr. at 73). Defendant was not handcuffed or otherwise restrained while he was at the house (Tr. at 62, 74).

8. The officers searched the house pursuant to defendant's verbal consent, and they found approximately two kilograms of cocaine, a heat sealer, a scale, a Glock .40-caliber handgun, gloves, Ziploc bags, keys, documents and cash (Tr. at 14, 80).

---

[2]The form was translated by Detective Ortiz as follows:  I, Rodolfo Zambrano, freely and voluntarily giving the officers of the Kansas City, Missouri, Police Department consent to search my residence and to recover anything and any property or article or any substance that the police department determines relevant either for any investigation or for any criminal case.  I am also giving consent to take any photographs, recordings, videos or any articles of property that will be used in any criminal activity and they can take those articles if used in a criminal activity. I also understand that the police department does not have a search warrant and that I have a right to negate or not give them consent to search the residence.  I also understand that any property that could be found in the residence could be used against me in court (Tr. at 24-25).

7

The cocaine and the heat sealer were found in the kitchen, and the digital scale was found in the basement (Tr. at 14, 53 ). One kilo of cocaine was sitting on the kitchen counter[3] and the other was found in a kitchen drawer (Tr. at 53, 55). The correspondence recovered during the search of 2613 Lister bearing defendant's name had an address of 1815 Hardesty (Tr. at 67-68). It is very common in the drug business for someone to maintain a residence where he lives and another residence where he does business (Tr. at 68).

9.    Present in the residence with defendant and Jesus Zambrano were Detective Ortiz, Special Agent Lester, Dave Pruetting, Detective Hendershott, Special Agent Mark King, other ICE detention officers, and detectives in the Gang Squad (Tr. at 16). They were wearing black vests with "police" on the front and the back (Tr. at 16, 38). At no time during the search did defendant or Jesus Zambrano object to the search (Tr. at 17-18, 25). This encounter with defendant and the search of the house occurred between 6:00 and 6:30 p.m. (Tr. at 14). Defendant was placed under arrest once the above listed items were found (Tr. at 25).

---

[3]None of the officers noticed the cocaine on the counter while performing the security sweep (Tr. at 55). The officers were looking for people, they were not observing the objects in the house (Tr. at 55-56).

10. At approximately 6:30 p.m. when the officers were getting ready to leave the residence, two men -- Edwin Rodriguez and Fernando Burgoa -- came into the front door (Tr. at 14-15). The officers asked who the men were, and they provided their identities (Tr. at 15). At the same time, Edwin Rodriguez said he was carrying a gun in his waistband (Tr. at 15-16, 17). Detective Ortiz yelled, "Gun!" to alert the other officers that there was a gun involved, and he told Mr. Rodriguez to put his hands on the back of his head so that Detective Ortiz could retrieve the gun (Tr. at 17). Mr. Rodriguez cooperated, and Detective Ortiz removed the gun from Rodriguez's front waistband (Tr. at 17).

11. Detective Ortiz asked if either of them lived at the residence, and both said they did (Tr. at 15). Neither of them objected to the fact that the residence had been searched (Tr. at 18).

12. Defendant, Jesus Zambrano, Edwin Rodriguez, and Fernando Burgoa spent the night in the same cell in the jail (Tr. at 98).

13. The following day, December 11, 2008, at approximately 3:30 p.m., Detective Ortiz, Special Agent Lester and Special Agent King met with defendant at police headquarters (Tr. at 25, 63). Detective Ortiz presented defendant with <u>Miranda</u> waiver

forms written in Spanish[4] and in English, and defendant chose the one written in Spanish (Tr. at 64, 65). Detective Ortiz read the form aloud to defendant (Tr. at 25-26, 64, 65). Defendant also read the form himself (Tr. at 26, 64, 65). Defendant agreed to discuss the circumstances of his arrest but he said he did not want to sign the <u>Miranda</u> waiver form (Tr. at 27, 64, 65). No one threatened defendant, no one made any promises to defendant, and no one tricked defendant into agreeing to talk about his case (Tr. at 27-28). Defendant never asked for an attorney and never invoked his right to remain silent (Tr. at 28, 67).

14. Defendant admitted to possessing the cocaine that was found in the residence (Tr. at 28). He said he could not provide information about his suppliers because he feared for his life and the lives of his relatives in Mexico (Tr. at 28). Defendant said that Jesus Zambrano had nothing to do with the cocaine found in the residence (Tr. at 28-29). Defendant's interview lasted until 4:30 (Tr. at 25). Detective Ortiz gave defendant an opportunity to provide a written statement, but he declined (Tr. at 69-70). Defendant said he would not give a written statement

---

[4]Detective Ortiz translated the form as follows: Before being asked any questions, I have been notified of my right to remain silent, that everything I say can be used against me in the court, and that I have the right to talk to a lawyer and to have the lawyer with me during questioning. I have also been told that if I cannot afford a lawyer one would be assigned to me without me having to pay. I have also been told that I can end this interview at any time. I understand all these rights and then I am willing to talk to you (Tr. at 29).

because he feared for his life (Tr. at 70).

15.   At the time defendant was being questioned, Jesus
Zambrano, Edwin Rodriguez, and Fernando Burgoa were also being
questioned by other officers (Tr. at 30).   During the interviews,
the officers often left the interview rooms after receiving an
answer from a suspect and compared what the other suspects were
saying (Tr. at 66, 70).

16.   Defendant was 33 years of age at the time of this
incident (Tr. at 82).   He was born in El Paso, Texas (Tr. at 82).
Defendant can read and write in English (Tr. at 82).

17.   Defendant testified as follows:

   a.   Defendant can speak fluent Spanish but he cannot
read or write in Spanish (Tr. at 82-83, 111).

   b.   On December 10, 2008, defendant was at 2613 Lister
in Kansas City fixing up the house for his aunt, Lourdes
Quesada, who was in Mexico at the time (Tr. at 83-84).   He
had gone to the residence in his green Chrysler (Tr. at 87).
Defendant had some clothes at the residence and would stay
overnight occasionally (Tr. at 84).   Defendant had keys to
the house, but so did about ten other people (Tr. at 84-85).
Defendant's actual residence was 1815 Hardesty Avenue with
his parents, Leticia Zambrano and Antonio Rodriguez (Tr. at
85).

   c.   At the time of this incident, defendant was on
probation for a case out of Johnson County, Kansas, but was
being supervised by a Missouri Probation Officer (Tr. at 85-
86).   He had previously been advised of <u>Miranda</u> rights on
one occasion (Tr. at 86).   He knew from watching television

that police needed a warrant to come into a residence (Tr. at 86).

d.     When police arrived on December 10, defendant was sitting on the couch playing Wii, a computer video game that is played on television (Tr. at 86).  Jesus Zambrano, defendant's cousin, was also in the residence and was vacuuming at the time (Tr. at 87).  The two of them had just finished "doing everything that we had to do inside the house" and were cleaning it before they left (Tr. at 87).

e.     At approximately 6:00 p.m., out of the corner of his eye, defendant saw the front door open and someone stuck his head inside (Tr. at 88).  The storm door on the house has mirrored windows so that you can see out but you cannot see in (Tr. at 89).  The door had been closed but unlocked (Tr. at 89).  As the man entered the residence, he was asking, "Are you Rodolfo Zambrano?" (Tr. at 88, 89).  The man was Detective Ortiz (Tr. at 88).  He told Jesus Zambrano to shut off the vacuum cleaner and sit on the couch with defendant (Tr. at 91).

f.     As defendant asked, "Who are you?" he saw that Detective Ortiz's vest said, "Police" (Tr. at 88).  Two other men had followed Detective Ortiz inside (Tr. at 88).  Detective Ortiz asked where defendant was born, how did he get here, whose papers was he was using (Tr. at 88).  Defendant said he was legal, is a United States resident, that he was born in El Paso, Texas (Tr. at 88, 91).

g.     Defendant asked why the men were there, and Detective Ortiz said that neighbors complained about a lot of traffic in the house and they believed drugs were being sold there (Tr. at 90).  When defendant tried to stand up, he was told to sit back down (Tr. at 92).

h.   Detective Ortiz set a yellow piece of paper and a pen on a table and said he needed defendant to "sign this" so the detective could search the house (Tr. at 92, 95). Defendant asked what it was, and Detective Ortiz said it was a consent to search (Tr. at 92).   Defendant saw that it was a blank piece of yellow paper with just a "couple lines" (Tr. at 93, 94-95).   Defendant said he could not sign the paper, that it was not his house (Tr. at 92, 95).   Detective Ortiz said he was going to search the house anyway (Tr. at 93).

I.   Next, the officers brought in "all their computers," two or three of them, and started checking Social Security numbers while other officers searched the house (Tr. at 93-94).

j.   Defendant never gave permission to search the house (Tr. at 94).   Detective Ortiz never asked for permission to do a quick look through the house to see if any other people were present (Tr. at 94, 110).   Defendant told Detective Ortiz 10 to 15 times to stop searching, that he should not be in the house because defendant did not give him permission to come in (Tr. at 94).

k.   On December 11, 2008, defendant was put in an interrogation room with Detective Ortiz and Special Agent King (Tr. at 99).   One of them read defendant his Miranda rights (Tr. at 99).   He was given a Miranda waiver form written in English (Tr. at 99-100).   He read the form and he initialed it (Tr. at 100).   He said he would initial the form where it said he was advised of his Miranda rights, but he would exercise his right to an attorney and his right to remain silent (Tr. at 100).   At that time, the conversation stopped and defendant was taken back up to his cell (Tr. at 100-101).   Defendant did not make any statement of guilt,

but he did say that "with things going on [in] Mexico" if he really did know something, he would not be dumb enough to say anything (Tr. at 101). He was referring to all of the violence going on in Mexico (Tr. at 101).

l. Defendant said several times that he wanted an attorney (Tr. at 101).

18. I do not find defendant's testimony credible for the following reasons:

There are several inconsistencies in defendant's testimony. For example, defendant first testified that Detective Ortiz opened the door, poked his head in, and then entered the residence, but later testified that he told Detective Ortiz "at the door" that "you can't come in" (Tr. at 92). Defendant testified on direct examination, in relation to the officers' vests, "And then I seen it said 'Police'" (Tr. at 88). But when asked later whether Detective Ortiz had any identification that he was law enforcement, defendant said, "I can't remember, but I think it said 'Police' on his vest." (Tr. at 90). Defendant testified that he told Detective Ortiz "[H]ow am I going to have <u>Miranda</u> rights read to me in Spanish when I don't know the, you know, the meaning to it [in] Spanish." (Tr. at 100). Yet, earlier, he testified the he speaks fluent Spanish (Tr. at 82-83). When asked about this discrepancy

on cross examination, defendant was evasive with his

answers:

> Q.   So if he was apprising you of your rights with respect
>      to <u>Miranda</u>, or consent, if he told you in Spanish,
>      you'd understand those rights?
>
> A.   Well, like he said -- if he said them in Spanglish,[5]
>      that would be a little different, but he never said
>      them in English or in Spanish.
>
> Q.   My question to you, sir --
>
> A.   I would understand if he --
>
> Q.   -- is if he spoke to you in Spanish, would you
>      understand the language Spanish?
>
> A.   Not -- maybe it's not the same if it's in English or
>      Spanish.  But I, you know, I probably would -- I
>      probably would know what he would meant, what he was
>      meaning.
>
> Q.   So, you would understand Spanish?
>
> A.   Yes.  Yes, I would.

(Tr. at 111-112).

Defendant testified that although Detective Ortiz told

defendant to sit down on the living room couch, he placed

the consent paper on a table in the dining room and told

defendant to sign it (Tr. at 93).

Defendant testified that the consent form was actually

a yellow piece of paper with nothing on it but a couple of

lines (Tr. at 93).  It makes little sense that Detective

Ortiz would attempt to force defendant to sign a yellow

---

[5]Spanglish is a mixture of English and Spanish (Tr. at 12).

piece of paper that was essentially blank rather than forcing him to sign an official consent-to-search form. In fact, a consent-to-search form has three paragraphs of writing in addition to a half a page of lines for signatures and items seized (P. Ex. 11).

If Detective Ortiz were going to make up a story after searching the house illegally, he could have said he saw the cocaine on the kitchen counter during the sweep and used that information to get a warrant rather than making up a story where a suspect gave verbal consent to search but refused to provide written consent.

Defendant testified that Detective Ortiz said that he was going to search the house anyway, without defendant's consent. Defendant later testified that Detective Ortiz told defendant he would get ten years in prison if he did not consent to the search (Tr. at 95-96). It makes no sense that Detective Ortiz would make threats to obtain a consent if he said he was going to search the house without consent.

Defendant was asked during cross examination if he was "apprised" of his <u>Miranda</u> rights when he was arrested in 1996, and he said, "yes" (Tr. at 102-103). This was consistent with his testimony on direct examination when he said he had been advised of his <u>Miranda</u> rights "I think once" before (Tr. at 86). Later, defendant was asked

whether he was "apprised" of his <u>Miranda</u> rights when he was arrested in Johnson County in a case that ended in a guilty plea in February 2008. After this second question, defendant indicated he did not know the meaning of the word "apprised" (Tr. at 104). He finally agreed that he had been informed of his <u>Miranda</u> rights on that occasion as well. This is inconsistent with his earlier testimony that he was previously advised of his <u>Miranda</u> rights "I think once," and his evasiveness suggests that he did not want to answer the question because he knew the answer would conflict with his earlier testimony, which it did.

Defendant admitted that Detective Ortiz would have no way of knowing how many people were in the house or whether they were armed, but he opened the front door and stuck his head in the room anyway, which is not plausible (Tr. at 107-108).

Defendant testified that he could not remember whether Detective Ortiz had his gun drawn when he walked into the house, even though defendant was surprised by this stranger entering the residence (Tr. at 109). It is not plausible that defendant would be concentrating on trying to recognize Ortiz's face (Tr. at 109) and not notice whether a gun was being pointed at him.

Although defendant testified that he initialed the Miranda waiver form indicating he had been advised of his rights, no initials appear on the form (P. Ex. 13). When asked about that, he said, "I don't know where it went." (Tr. at 113).

### III. CONSENT TO SEARCH

Even when police officers have neither probable cause nor a warrant, they may search an area if they obtain a voluntary consent from someone possessing adequate authority over the area. United States v. Matlock, 415 U.S. 164, 171 & n. 7 (1974); Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973).

In this case, the voluntariness of defendant's consent is not really an issue. Defendant testified that he *did not* consent to either the security sweep or the actual search of the residence, not that his consent was coerced. Detective Ortiz testified that defendant did consent to both the sweep and the search. Where the only evidence presented is "he-said-she-said" testimony, the court must determine credibility in order to arrive at a factual finding. United States v. Ralph, 400 F.3d 888, 890 (8th Cir. 2007); United States v. Carothers, 337 F.3d 1017, 1019 (8th Cir. 2003).

As discussed above, I find that defendant's testimony that he refused to consent to the search is not credible and that Detective Ortiz's testimony was credible. Defendant was evasive

at times, his testimony is internally inconsistent at times, and his version of the events is not plausible. On the other hand, if Detective Ortiz were lying, he likely would not have admitted that the police failed to notice a kilo of cocaine sitting in plain view on the kitchen counter during the security sweep, since that would have provided probable cause to obtain a search warrant.

In addition, the exhibits support Detective Ortiz's testimony rather than defendant's. Defendant testified that one could see outside the storm door, but not inside. However, defendant's exhibits 402 and 403 establish that the door acted as a mirror on both sides so long as the person looking through the door was in the light. For example, in 402, the view is through the outside of the door. It is light outside, and the outside of the door acts as a mirror reflecting the photographer. In 403, the view is through the inside of the door (which is opened in this picture). It is light outside and the inside of the door acts as a mirror reflecting the charcoal and grill that are on the porch. Defendant's exhibits 404 and 405 also show the mirror effect from the outside of the door, and defendant's exhibit 406 again shows the mirror effect on the inside of the door.

Defendant's exhibit 408 shows that one can see through the door if it is lighter on the other side (the porch rails are clearly visible through the door). In this exhibit, the overhead

light in the living room right by the front door has been turned off, but it is daylight outside. From the inside, one can see through the door to the brighter area, rather than experiencing the mirror effect. At the time Detective Ortiz arrived at this residence, the uncontested evidence is that it was dark outside and that Jesus Zambrano was inside vacuuming. It is not plausible that one would be vacuuming in the dark; therefore, it is safe to say that the lights were on inside the house. Based on the performance of this door in the exhibits, I find that Detective Ortiz would be able to see through the storm door because he was standing outside where it was dark and the inside of the living room was light.

Because I find that the testimony of Detective Ortiz is credible and the testimony of defendant is not, I find that defendant consented to the security sweep and the search of the residence. I further find credible the testimony that no threats or promises were made in order to get defendant to consent.

The final issue is whether defendant, who claims he was not a resident of the house, was capable of consenting to its search.

The Fourth Amendment does not prohibit entry into a person's home when voluntary consent has been obtained, either from the person whose property is searched or from someone with common authority over the premises. Illinois v. Rodriguez, 497 U.S. 177, 181 (1990). In assessing the reasonableness of a search

based on consent, it is relevant "whether the facts available would have justified a reasonable officer in the belief that the consenting party had authority over the premises." <u>United States v. Czeck</u>, 105 F.3d 1235, 1239 (8th Cir. 1997).

In this case, police had been told by four different sources that defendant was selling drugs in this residence. Police surveillance established that a man matching the description given by the informants did indeed come and go from the residence and he used a car that had been described by the informants. On the day of the search, police observed defendant come out of and go into the residence alone, they saw him sitting inside the residence playing a computer game on the television, and he told them that he had been taking care of the residence for three months for his aunt who was out of the country. In addition, defendant had keys to the residence, although it is not clear whether police knew that prior to asking defendant to consent to a search.

Based on the above, I find that the facts available would have justified a reasonable officer in the belief that defendant had authority over the residence and could therefore consent to its search.

## IV. *CONCLUSION*

Based on the above-stated findings of fact and the law as discussed in section III, I make the following conclusions of

law:

1.    Defendant had authority to consent to a search of the residence.

2.    Defendant voluntarily consented to the police entering his residence.

3.    Defendant voluntarily consented to the police conducting a security sweep of the residence.

4.    Defendant voluntarily consented to the search of the residence which resulted in the seizure of the cocaine and other items.

Therefore, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying defendant's motion to suppress evidence.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has 14 days from the date of this report and recommendation to file and serve specific objections.


                                  /s/ Robert E. Larsen
                                  ROBERT E. LARSEN
                                  United States Magistrate Judge

Kansas City, Missouri
March 11, 2010