IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES OF AMERICA,          )
                                   )
                  Plaintiff,       )
                                   )
        v.                         )    Criminal Action No.
                                   )    09-00252-01-CR-W-HFS
RODOLFO ZAMBRANO,                  )
                                   )
                  Defendant.       )

## REPORT AND RECOMMENDATION TO DENY
## DEFENDANT'S MOTION TO SUPPRESS STATEMENT

Before the court is defendant's motion to suppress his statement on the grounds that he was not advised of his <u>Miranda</u> rights, nor did he waive any rights. I find that defendant was advised of his <u>Miranda</u> rights and voluntarily waived those rights. Therefore, defendant's motion to suppress should be denied.

## I.   BACKGROUND

On December 10, 2008, police conducted a knock and talk after receiving several tips that defendant was selling drugs from 2613 Lister. The house was searched and police recovered two kilos of cocaine. Defendant was arrested and taken to jail. The next day, defendant was questioned by police who claim defendant was advised of his rights, waived those rights, and admitted the cocaine was his.

On August 11, 2009, an indictment was returned charging defendant with one count of possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and

(b)(1)(B).  Defendant filed the instant motion to suppress on
January 29, 2010 (document number 20).  On February 11, 2010,
the government filed a response in opposition (document number
26).

On February 16, 2010, I held an evidentiary hearing on
defendant's motion to suppress.  The government appeared by
Assistant United States Attorney Stefan Hughes.  The defendant
was present, represented by Robb Edmonds.  Detective Luis Ortiz
testified, as did defendant.  In addition, the following
exhibits were admitted:

P. Ex. 1   Photograph of the front of the residence

P. Ex. 2   Photograph of firearm

P. Ex. 3   A document from Johnson County Court Services
           addressed to defendant at 1815 Hardesty, Kansas
           City, Missouri 64127

P. Ex. 4   State of Missouri Department of Corrections travel
           permit to defendant listing a '99 Chrysler

P. Ex. 5   Money transfer document with the name Leticia
           Zambrano with the address of 1815 Hardesty showing
           transfer of $300 to Montes Elsa Guadalupe in Mexico

P. Ex. 6   Photograph of a kilo of cocaine found on the kitchen
           counter of defendant's residence

P. Ex. 7   Photograph of a kilo of cocaine found in a drawer in
           defendant's kitchen

P. Ex. 8   Photograph of defendant's driver's license, listing
           1815 Hardesty Avenue as his address, and $2,280
           seized from his wallet

P. Ex. 9   Photograph of cash seized from defendant

P. Ex. 10  Photograph of the digital scale found in defendant's
           basement

P. Ex. 11 Copy of consent to search form presented to defendant

P. Ex. 12 Copy of a Property Inventory Report showing that keys to 2613 Lister Avenue and keys for a green Chrysler were recovered from defendant

P. Ex. 14 Report of interrogation

P. Ex. 13 Copy of a <u>Miranda</u> waiver form written in Spanish

D. Ex. 401  Photograph of the front of the residence

D. Ex. 402  Photograph of the front of the residence

D. Ex. 403  Photograph of the storm door and door

D. Ex. 404  Photograph of the storm door closed

D. Ex. 405  Photograph of the storm door closed

D. Ex. 406  Photograph of the storm door open and the door closed

D. Ex. 407  Photograph of the inside of the residence

D. Ex. 408  Photograph of the opposite of the main entrance

D. Ex. 409  Photograph of the kitchen

D. Ex. 410  Photograph of the living or dining room and a table

D. Ex. 411  Photograph of a window next to a door

D. Ex. 412  Photograph of the TV and the main door

D. Ex. 413  Photograph of an open storm door

D. Ex. 414  Photograph of living room

## II.  EVIDENCE

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact:

1.   On October 24, 2008, Detective Luis Ortiz received information from a confidential informant that defendant was

selling large amounts of cocaine from his residence at 2613
Lister in Kansas City, Missouri (Tr. at 3-4, 30-31).  Defendant
was described as a heavy-set Hispanic male, 250 to 300 pounds,
five feet ten inches to six feet tall, who drives a green
Chrysler with tinted windows and personalized license plates
(Tr. at 4, 31).  Detective Ortiz had received similar
information from at least three other confidential informants
(Tr. at 4-5, 31-32).  At least three times after that,
Detective Ortiz conducted surveillance on defendant's residence
to try to verify the information provided by the informants
(Tr. at 5, 32).  He observed defendant coming and going from
the residence and using the Chrysler (Tr. at 5, 32).  Detective
Ortiz also did a computer check and learned that defendant had
been arrested in Kansas City, Missouri, and in Overland Park,
Kansas, for drug offenses (Tr. at 32).

     2.   At approximately 5:00 p.m., on December 10, 2008,
Detective Ortiz and other law enforcement officers were
conducting surveillance on defendant's residence (Tr. at 6).
The officers observed defendant come out of the residence, get
into his car for a few moments, then return to the residence
(Tr. at 6).  More officers were called in so that a knock-and-
talk could be done (Tr. at 6, 34).  With Detective Ortiz when
he called for more officers were Detective Hendershott and
Special Agent King from Immigration and Customs Enforcement
("ICE") (Tr. at 7).  Special Agent Lester was just a few blocks

away and was called by Detective Ortiz (Tr. at 7).

3.    The officers observed the storm door and the main door to the residence about halfway open (Tr. at 7).  At about 6:00 p.m., Detective Ortiz, Detective Hendershott, and Special Agent King went to the front door (Tr. at 36).  It was dark by then and the officers could see inside because the lights were on inside (Tr. at 39).  Detective Ortiz knocked on the storm door and identified himself to defendant who could be seen sitting on a couch inside the house (Tr. at 7-8, 36, 42, 52, 67).  Detective Ortiz also saw Jesus Zambrano who was vacuuming (Tr. at 9, 40, 41, 52).

4.    Defendant came to the door (Tr. at 8, 42). Detective Ortiz said he and the others were with the police department and ICE and had received information that defendant could possibly have narcotics in his residence and that he had been selling narcotics from his residence (Tr. at 8, 43). Detective Ortiz asked defendant if they could come inside to discuss the allegations, and he allowed the officers inside his residence (Tr. at 8-9, 43).

5.    As the officers entered the residence, defendant stated that it was not his house, that he was taking care of it for his aunt, Lourdes Quesada, who was in Mexico (Tr. at 9, 43-44, 84, 105).  He said he had been taking care of the house for about three months (Tr. at 9, 43-44).  For officer safety, Detective Ortiz asked defendant for permission to look through

the house for other people (Tr. at 9-10). Defendant gave his consent (Tr. at 10). No one threatened defendant or promised him anything in exchange for that consent (Tr. at 10). A security sweep was performed by Detective Hendershott, Special Agent King, and Dave Pruetting, who was Detective Ortiz's supervisor (Tr. at 10). No other people were discovered during the security sweep (Tr. at 10-11).

6.      Detective Ortiz asked defendant if there were any narcotics in the house, and he said there were not (Tr. at 11). Detective Ortiz asked defendant for permission to search the residence for narcotics (Tr. at 11). Detective Ortiz told defendant he did not have to consent (Tr. at 56). Defendant said his aunt owns the residence, and that the officers could search the residence but defendant could not give written consent because it was not his house (Tr. at 11, 12, 13-14, 24, 54, 62).

7.      Detective Ortiz spoke to defendant in both English and Spanish (Tr. at 11, 12, 44). Both defendant and Detective Ortiz are fluent in Spanish and English (Tr. at 11-12, 74). The consent-to-search form presented to defendant was written in both English and Spanish[1] (Tr. at 12). Defendant read the

---

[1]The form was translated by Detective Ortiz as follows: I, Rodolfo Zambrano, freely and voluntarily giving the officers of the Kansas City, Missouri, Police Department consent to search my residence and to recover anything and any property or article or any substance that the police department determines relevant either for any investigation or for any criminal case.

Spanish version (Tr. at 12, 24). When defendant declined to
sign the form, he said it was because his aunt was the owner of
the residence (Tr. at 12). Defendant did not mention anything
about an Edwin Rodriguez living in the residence (Tr. at 12-
13). No one promised defendant anything to get him to consent
to the search (Tr. at 73). Defendant was not handcuffed or
otherwise restrained while he was at the house (Tr. at 62, 74).

8.    The officers searched the house pursuant to
defendant's verbal consent, and they found approximately two
kilograms of cocaine, a heat sealer, a scale, a Glock .40-
caliber handgun, gloves, Ziploc bags, keys, documents and cash
(Tr. at 14, 80). The cocaine and the heat sealer were found in
the kitchen, and the digital scale was found in the basement
(Tr. at 14, 53 ). One kilo of cocaine was sitting on the
kitchen counter[2] and the other was found in a kitchen drawer
(Tr. at 53, 55). The correspondence recovered during the
search of 2613 Lister bearing defendant's name had an address

---

I am also giving consent to take any photographs, recordings,
videos or any articles of property that will be used in any
criminal activity and they can take those articles if used in a
criminal activity. I also understand that the police department
does not have a search warrant and that I have a right to
negate or not give them consent to search the residence.  I
also understand that any property that could be found in the
residence could be used against me in court (Tr. at 24-25).

[2]None of the officers noticed the cocaine on the counter
while performing the security sweep (Tr. at 55).  The officers
were looking for people, they were not observing the objects in
the house (Tr. at 55-56).

of 1815 Hardesty (Tr. at 67-68). It is very common in the drug business for someone to maintain a residence where he lives and another residence where he does business (Tr. at 68).

9. Present in the residence with defendant and Jesus Zambrano were Detective Ortiz, Special Agent Lester, Dave Pruetting, Detective Hendershott, Special Agent Mark King, other ICE detention officers, and detectives in the Gang Squad (Tr. at 16). They were wearing black vests with "police" on the front and the back (Tr. at 16, 38). At no time during the search did defendant or Jesus Zambrano object to the search (Tr. at 17-18, 25). This encounter with defendant and the search of the house occurred between 6:00 and 6:30 p.m. (Tr. at 14). Defendant was placed under arrest once the above listed items were found (Tr. at 25).

10. At approximately 6:30 p.m. when the officers were getting ready to leave the residence, two men -- Edwin Rodriguez and Fernando Burgoa -- came into the front door (Tr. at 14-15). The officers asked who the men were, and they provided their identities (Tr. at 15). At the same time, Edwin Rodriguez said he was carrying a gun in his waistband (Tr. at 15-16, 17). Detective Ortiz yelled, "Gun!" to alert the other officers that there was a gun involved, and he told Mr. Rodriguez to put his hands on the back of his head so that Detective Ortiz could retrieve the gun (Tr. at 17). Mr. Rodriguez cooperated, and Detective Ortiz removed the gun from

Rodriguez's front waistband (Tr. at 17).

11. Detective Ortiz asked if either of them lived at the residence, and both said they did (Tr. at 15). Neither of them objected to the fact that the residence had been searched (Tr. at 18).

12. Defendant, Jesus Zambrano, Edwin Rodriguez, and Fernando Burgoa spent the night in the same cell in the jail (Tr. at 98).

13. The following day, December 11, 2008, at approximately 3:30 p.m., Detective Ortiz, Special Agent Lester and Special Agent King met with defendant at police headquarters (Tr. at 25, 63). Detective Ortiz presented defendant with <u>Miranda</u> waiver forms written in Spanish[3] and in English, and defendant chose the one written in Spanish (Tr. at 64, 65). Detective Ortiz read the form aloud to defendant (Tr. at 25-26, 64, 65). Defendant also read the form himself (Tr. at 26, 64, 65). Defendant agreed to discuss the circumstances of his arrest but he said he did not want to sign the <u>Miranda</u> waiver form (Tr. at 27, 64, 65). No one threatened defendant,

---

[3]Detective Ortiz translated the form as follows: Before being asked any questions, I have been notified of my right to remain silent, that everything I say can be used against me in the court, and that I have the right to talk to a lawyer and to have the lawyer with me during questioning. I have also been told that if I cannot afford a lawyer one would be assigned to me without me having to pay. I have also been told that I can end this interview at any time. I understand all these rights and then I am willing to talk to you (Tr. at 29).

no one made any promises to defendant, and no one tricked defendant into agreeing to talk about his case (Tr. at 27-28). Defendant never asked for an attorney and never invoked his right to remain silent (Tr. at 28, 67).

14.  Defendant admitted to possessing the cocaine that was found in the residence (Tr. at 28).  He said he could not provide information about his suppliers because he feared for his life and the lives of his relatives in Mexico (Tr. at 28). Defendant said that Jesus Zambrano had nothing to do with the cocaine found in the residence (Tr. at 28-29).  Defendant's interview lasted until 4:30 (Tr. at 25).  Detective Ortiz gave defendant an opportunity to provide a written statement, but he declined (Tr. at 69-70).  Defendant said he would not give a written statement because he feared for his life (Tr. at 70).

15.  At the time defendant was being questioned, Jesus Zambrano, Edwin Rodriguez, and Fernando Burgoa were also being questioned by other officers (Tr. at 30).  During the interviews, the officers often left the interview rooms after receiving an answer from a suspect and compared what the other suspects were saying (Tr. at 66, 70).

16.  Defendant was 33 years of age at the time of this incident (Tr. at 82).  He was born in El Paso, Texas (Tr. at 82).  Defendant can read and write in English (Tr. at 82).

17.  Defendant testified as follows:

a.    Defendant can speak fluent Spanish but he cannot read or write in Spanish (Tr. at 82-83, 111).

b.    On December 10, 2008, defendant was at 2613 Lister in Kansas City fixing up the house for his aunt, Lourdes Quesada, who was in Mexico at the time (Tr. at 83-84).  He had gone to the residence in his green Chrysler (Tr. at 87).  Defendant had some clothes at the residence and would stay overnight occasionally (Tr. at 84).  Defendant had keys to the house, but so did about ten other people (Tr. at 84-85).  Defendant's actual residence was 1815 Hardesty Avenue with his parents, Leticia Zambrano and Antonio Rodriguez (Tr. at 85).

c.    At the time of this incident, defendant was on probation for a case out of Johnson County, Kansas, but was being supervised by a Missouri Probation Officer (Tr. at 85-86).  He had previously been advised of <u>Miranda</u> rights on one occasion (Tr. at 86).  He knew from watching television that police needed a warrant to come into a residence (Tr. at 86).

d.    When police arrived on December 10, defendant was sitting on the couch playing Wii, a computer video game that is played on television (Tr. at 86).  Jesus Zambrano, defendant's cousin, was also in the residence and was vacuuming at the time (Tr. at 87).  The two of them had just finished "doing everything that we had to do inside the house" and were cleaning it before they left (Tr. at 87).

e.    At approximately 6:00 p.m., out of the corner of his eye, defendant saw the front door open and someone stuck his head inside (Tr. at 88).  The storm door on the house has mirrored windows so that you can see out but you cannot see in (Tr. at 89).  The door had been closed but unlocked (Tr. at 89).  As the man entered the residence,

he was asking, "Are you Rodolfo Zambrano?" (Tr. at 88, 89). The man was Detective Ortiz (Tr. at 88). He told Jesus Zambrano to shut off the vacuum cleaner and sit on the couch with defendant (Tr. at 91).

f. As defendant asked, "Who are you?" he saw that Detective Ortiz's vest said, "Police" (Tr. at 88). Two other men had followed Detective Ortiz inside (Tr. at 88). Detective Ortiz asked where defendant was born, how did he get here, whose papers was he was using (Tr. at 88). Defendant said he was legal, is a United States resident, that he was born in El Paso, Texas (Tr. at 88, 91).

g. Defendant asked why the men were there, and Detective Ortiz said that neighbors complained about a lot of traffic in the house and they believed drugs were being sold there (Tr. at 90). When defendant tried to stand up, he was told to sit back down (Tr. at 92).

h. Detective Ortiz set a yellow piece of paper and a pen on a table and said he needed defendant to "sign this" so the detective could search the house (Tr. at 92, 95). Defendant asked what it was, and Detective Ortiz said it was a consent to search (Tr. at 92). Defendant saw that it was a blank piece of yellow paper with just a "couple lines" (Tr. at 93, 94-95). Defendant said he could not sign the paper, that it was not his house (Tr. at 92, 95). Detective Ortiz said he was going to search the house anyway (Tr. at 93).

I. Next, the officers brought in "all their computers," two or three of them, and started checking Social Security numbers while other officers searched the house (Tr. at 93-94).

j. Defendant never gave permission to search the house (Tr. at 94). Detective Ortiz never asked for permission to do a quick look through the house to see if

any other people were present (Tr. at 94, 110).  Defendant
told Detective Ortiz 10 to 15 times to stop searching,
that he should not be in the house because defendant did
not give him permission to come in (Tr. at 94).

k.    On December 11, 2008, defendant was put in an
interrogation room with Detective Ortiz and Special Agent
King (Tr. at 99).  One of them read defendant his <u>Miranda</u>
rights (Tr. at 99).  He was given a <u>Miranda</u> waiver form
written in English (Tr. at 99-100).  He read the form and
he initialed it (Tr. at 100).  He said he would initial
the form where it said he was advised of his <u>Miranda</u>
rights, but he would exercise his right to an attorney and
his right to remain silent (Tr. at 100).  At that time,
the conversation stopped and defendant was taken back up
to his cell (Tr. at 100-101).  Defendant did not make any
statement of guilt, but he did say that "with things going
on [in] Mexico" if he really did know something, he would
not be dumb enough to say anything (Tr. at 101).  He was
referring to all of the violence going on in Mexico (Tr.
at 101).

l.    Defendant said several times that he wanted an
attorney (Tr. at 101).

18.    I do not find defendant's testimony credible for the
following reasons:

There are several inconsistencies in defendant's
testimony.  For example, defendant first testified that
Detective Ortiz opened the door, poked his head in, and
then entered the residence, but later testified that he
told Detective Ortiz "at the door" that "you can't come
in" (Tr. at 92).  Defendant testified on direct

13

examination, in relation to the officers' vests, "And then I seen it said 'Police'" (Tr. at 88).  But when asked later whether Detective Ortiz had any identification that he was law enforcement, defendant said, "I can't remember, but I think it said 'Police' on his vest." (Tr. at 90).  Defendant testified that he told Detective Ortiz "[H]ow am I going to have <u>Miranda</u> rights read to me in Spanish when I don't know the, you know, the meaning to it [in] Spanish." (Tr. at 100).  Yet, earlier, he testified the he speaks fluent Spanish (Tr. at 82-83).  When asked about this discrepancy on cross examination, defendant was evasive with his answers:

Q.   So if he was apprising you of your rights with respect to <u>Miranda</u>, or consent, if he told you in Spanish, you'd understand those rights?

A.   Well, like he said -- if he said them in Spanglish,[4] that would be a little different, but he never said them in English or in Spanish.

Q.   My question to you, sir --

A.   I would understand if he --

Q.   -- is if he spoke to you in Spanish, would you understand the language Spanish?

A.   Not -- maybe it's not the same if it's in English or Spanish.  But I, you know, I probably would -- I probably would know what he would meant, what he was meaning.

Q.   So, you would understand Spanish?

---

[4]Spanglish is a mixture of English and Spanish (Tr. at 12).

14

A.   Yes.  Yes, I would.

(Tr. at 111-112).

Defendant testified that although Detective Ortiz told defendant to sit down on the living room couch, he placed the consent paper on a table in the dining room and told defendant to sign it (Tr. at 93).

Defendant testified that the consent form was actually a yellow piece of paper with nothing on it but a couple of lines (Tr. at 93).  It makes little sense that Detective Ortiz would attempt to force defendant to sign a yellow piece of paper that was essentially blank rather than forcing him to sign an official consent-to-search form.  In fact, a consent-to-search form has three paragraphs of writing in addition to a half a page of lines for signatures and items seized (P. Ex. 11).

If Detective Ortiz were going to make up a story after searching the house illegally, he could have said he saw the cocaine on the kitchen counter during the sweep and used that information to get a warrant rather than making up a story where a suspect gave verbal consent to search but refused to provide written consent.

Defendant testified that Detective Ortiz said that he was going to search the house anyway, without defendant's consent.  Defendant later testified that Detective Ortiz told defendant he would get ten years in

prison if he did not consent to the search (Tr. at 95-96).
It makes no sense that Detective Ortiz would make threats
to obtain a consent if he said he was going to search the
house without consent.

Defendant was asked during cross examination if he
was "apprised" of his Miranda rights when he was arrested
in 1996, and he said, "yes" (Tr. at 102-103). This was
consistent with his testimony on direct examination when
he said he had been advised of his Miranda rights "I think
once" before (Tr. at 86). Later, defendant was asked
whether he was "apprised" of his Miranda rights when he
was arrested in Johnson County in a case that ended in a
guilty plea in February 2008. After this second question,
defendant indicated he did not know the meaning of the
word "apprised" (Tr. at 104). He finally agreed that he
had been informed of his Miranda rights on that occasion
as well. This is inconsistent with his earlier testimony
that he was previously advised of his Miranda rights "I
think once," and his evasiveness suggests that he did not
want to answer the question because he knew the answer
would conflict with his earlier testimony, which it did.

Defendant admitted that Detective Ortiz would have
no way of knowing how many people were in the house or
whether they were armed, but he opened the front door and
stuck his head in the room anyway, which is not plausible

(Tr. at 107-108).

Defendant testified that he could not remember whether Detective Ortiz had his gun drawn when he walked into the house, even though defendant was surprised by this stranger entering the residence (Tr. at 109). It is not plausible that defendant would be concentrating on trying to recognize Ortiz's face (Tr. at 109) and not notice whether a gun was being pointed at him.

Although defendant testified that he initialed the <u>Miranda</u> waiver form indicating he had been advised of his rights, no initials appear on the form (P. Ex. 13). When asked about that, he said, "I don't know where it went." (Tr. at 113).

### III. *MIRANDA*

Defendant argues that his statement should be suppressed because he was not advised of his <u>Miranda</u> rights. The government bears the burden of proving by a preponderance of the evidence that defendant made a knowing and voluntary waiver of his <u>Miranda</u> rights. <u>Colorado v. Connelly</u>, 479 U.S. 157, 158 (1986); <u>United States v. Dougherty</u>, 810 F.2d 763, 772 (8th Cir. 1987). There is no requirement that, to be voluntary, the waiver be the product of a free will. <u>Connelly</u>, 479 U.S. at 170. The sole concern of the Fifth Amendment, upon which <u>Miranda</u> was based, is governmental coercion. <u>Id.</u>; <u>United States v. Washington</u>, 431 U.S. 181, 187 (1977). The

voluntariness of a waiver of this privilege depends on the absence of police overreaching, i.e., the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. <u>Connelly</u>, 479 U.S. at 170; <u>Moran v. Burbine</u>, 475 U.S. 412, 420 (1986); <u>Fare v. C.</u>, 442 U.S. 707, 726-27 (1979).

An explicit statement of waiver is not invariably necessary to support a finding that the defendant waived his <u>Miranda</u> rights. <u>North Carolina v. Butler</u>, 441 U.S. 369 (1979). An express written or oral statement of waiver of <u>Miranda</u> rights is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. <u>Id</u>. at 373.

> The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived his rights delineated in the <u>Miranda</u> case. As was unequivocally said in <u>Miranda</u>, mere silence is not enough. That doesn't mean that the defendant's silence, coupled with an understanding of his rights and course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. . . . [I]n at least some cases waiver can be clearly inferred from the actions and words of the person interrogated.

<u>Id</u>. at 373.

Whether a defendant waived his <u>Miranda</u> rights is a question of fact for the trial judge and must be determined on the particular facts and circumstances surrounding the case, including the background, experience and conduct of the

accused.  Id. at 374; United States v. Dougherty, 810 F.2d 763,
772 (8th Cir. 1987); Stumes v. Solem, 752 F.2d 317, 319 (8th
Cir. 1985).  The totality of the circumstances test applies.
Dougherty, 810 F.2d at 773.

In this case, defendant argued in his motion that he was
not advised of his Miranda rights.  However, when he took the
stand during the hearing, he testified that he was indeed
advised of his Miranda rights.

All of the uncontradicted evidence establishes that
defendant was not threatened or coerced into waiving his
rights, he was not promised any leniency or any other benefit,
he was not under the influence of alcohol or drugs, he was not
overly fatigued or distraught.  Detective Ortiz testified that
no promises or threats were made.  Defendant did not say that
any threats or promises were made to get him to waive his
rights.  Defendant had been in custody since the day before.
Even if there had been evidence that he was under the influence
of any substance, it would most likely have worn off by then.
Defendant was taken from his residence at approximately 6:30
p.m. on December 10, and he was not questioned until
approximately 3:30 p.m. the next day.  There is no allegation
or evidence that defendant was deprived of sleep during those
21 hours.

Based on the above, I find that defendant voluntarily
waived his Miranda rights.

In determining whether a confession is voluntary, a court should examine the circumstances surrounding the statement, including the conduct of the law enforcement officials and the capacity of the suspect to resist pressure to confess. United States v. Mendoza, 85 F.3d 1347, 1350 (8th Cir. 1996); United States v. Johnson, 47 F.3d 272, 275-76 (8th Cir. 1995). Coercive government activity is necessary to prove that a statement was not voluntary. Colorado v. Connelly, 479 U.S. 157, 163-64 (1986); United States v. Hatten, 68 F.3d 257, 262 (8th Cir. 1995, cert. denied, 516 U.S. 1150 (1996). However, misrepresentations on the part of the government do not make a statement per se involuntary. United States v. Petary, 857 F.2d 458, 461 (8th Cir. 1988); Flittie v. Solem, 775 F.2d 933, 945 (8th Cir. 1985) (en banc), cert. denied, 475 U.S. 1025 (1986). It is only one factor to be considered in reviewing the totality of the circumstances. Frazier v. Cupp, 394 U.S. 731, 739 (1969); United States v. Petary, 857 F.2d at 461. See also United States v. Mendoza, 85 F.3d at 1350 (statement voluntary even though defendant was told that the only alternative to cooperating with the police was immediate arrest); United States v. Harris, 914 F.2d 927, 933 (7th Cir. 1990) (police may solicit confession by offering to reduce charges against defendant). Even using a raised voice when interrogating a suspect will not render a confession involuntary unless the overall impact of the interrogation

caused the defendant's will to be overborne.  <u>Jenner v. Smith</u>,
982 F.2d 329, 334 (8th Cir. 1993).

In this case, there is no evidence that defendant's
statements were involuntary.  There is no evidence that
defendant's statements were the result of coercion, duress,
threats, tricks, promises, or false pretenses.  In defendant's
motion, he does not provide a factual basis for suppression
other than stating that he "did not make a knowing and
voluntary waiver of his <u>Miranda</u> rights such that any statement
he made might be used against him."  Even defendant's testimony
does not allege that he made a statement involuntarily.

The questioning of defendant lasted from 3:33 p.m. until
approximately 4:30 p.m. (Tr. at 25).  That totals about 57
minutes.  This is not particularly lengthy for an
interrogation.  <u>See</u> <u>Jenner v. Smith</u>, 982 F.2d 328, 334 (8th
Cir. 1993) (questioning a suspect for six or seven hours is not
unconstitutionally coercive per se).

Defendant was 33 years of age, he admitted that he can
read and write, he admitted that he has past experience with
criminal cases during which he was advised of his <u>Miranda</u>
rights, he provided a legitimate reason for not giving the name
of his supplier or wanting to sign any forms, and he answered
questions appropriately.  There is no evidence that defendant's
will was overborne by law enforcement.  To the extent that
defendant now claims he did not make a statement at all, I find

that testimony not credible for the reasons outlined in paragraph II.18 above.

The credible evidence establishes that defendant was not coerced and that he confessed for reasons unrelated to police conduct.  There is no evidence that defendant's statement was anything other than voluntary.

### IV.  *CONCLUSION*

Based on the above-stated findings of fact and the law as discussed in section III, I make the following conclusions of law:

1.    Defendant was advised of his <u>Miranda</u> rights.

2.    Defendant knowingly and voluntarily waived his <u>Miranda</u> rights.

3.    Defendant's confession was voluntary.

Therefore, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying defendant's motion to suppress his statement.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has 14 days from the date of this report and recommendation to file and serve specific objections.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
March 11, 2010